Filed 11/16/22  In re S.R. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re S.R., A Person Coming Under the Juvenile Court Law. | B316021 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>B.S.,<br><br>    Defendant and Appellant. | (Los Angeles County Super. Ct. No. 19CCJP04919A)<br><br><br> ORDER MODIFYING OPINION [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on November 15, 2022, be modified as follows:

1.  On page 1, the superior court number is corrected to read 19CCJP04919A.

[There is no change in the judgment.]

_____

RICHARDSON (ANNE K.), J.*     LAVIN, Acting P.J.     EGERTON, J.

*    Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 11/15/22  In re S.R. CA2/3 (unmodified opinion)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re S.R., A Person Coming Under the Juvenile Court Law. | B316021 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>B.S.,<br><br>Defendant and Appellant. | (Los Angeles County Super. Ct. No. 19CJP04919A) |

APPEAL from an order of the Superior Court of Los Angeles County, Lisa A. Brackelmanns, Juvenile Court Referee. Affirmed.

Suzanne M. Nicholson, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Aileen Wong, Deputy County Counsel, for Plaintiff and Respondent.

—————————————

B.S. (mother) appeals from the juvenile court's order terminating parental rights over her three-year-old daughter, S.R., pursuant to Welfare and Institutions Code[1] section 366.26. Mother contends the juvenile court and the Los Angeles County Department of Children and Family Services (DCFS) failed to comply with the inquiry and notice provisions of the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.) and related California law.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.     The Dependency Proceedings

On August 2, 2019, DCFS filed a section 300 petition on behalf of then one-month-old S.R.  The petition, as later amended, alleged that mother had a history of domestic violence with S.R.'s alleged father, J.F., and another male companion; that mother had a history of mental and emotional problems; that mother and J.F. had a history of substance abuse, including cocaine and marijuana; that S.R.'s older half-sibling was a prior dependent of the court and had received permanent placement services based on mother's substance abuse; and that S.R. had a positive toxicology screen for marijuana at birth.  On August 5, 2019, S.R. was detained from mother and placed in foster care.

At the adjudication hearing held on October 15, 2020, the juvenile court sustained the amended petition under section 300, subdivisions (b) and (j) based on mother's history of substance abuse, mental and emotional problems, and domestic violence with an unrelated male companion.  The counts related to J.F. were dismissed following a paternity test that showed he was not

---

[1] Unless otherwise stated, all further statutory references are to the Welfare and Institutions Code.

S.R.'s biological father. At the disposition hearing held on November 16, 2020, the court declared S.R. a dependent of the court, removed the child from mother's custody, and ordered the bypass of reunification services pursuant to section 361.5, subdivision (b)(10).

After several continuances, the section 366.26 permanency planning hearing for S.R. was held on October 26, 2021. The juvenile court found by clear and convincing evidence that the child was adoptable, and that no exception to the termination of parental rights applied. The court terminated parental rights over S.R. and transferred care, custody and control of the child to DCFS for adoptive planning and placement. S.R.'s foster parents, with whom she had been placed since being detained from mother, were identified as her prospective adoptive parents.

Mother filed a timely notice of appeal from the order terminating her parental rights.

## II.    The ICWA Investigation and Findings

At the August 5, 2019 detention hearing, mother filed a Parental Notification of Indian Status form (Judicial Council Form ICWA-020) indicating that she may have Indian ancestry through the "Blackfoot" tribe. Upon inquiry by the juvenile court, mother stated that her "Blackfoot" ancestry was on her father's side of the family but she did not know if anyone was a registered tribal member. The court ordered DCFS to investigate mother's claim.

On October 7, 2019, DCFS mailed a first set of ICWA notices for S.R. to the Blackfeet Tribe of Montana, the Bureau of Indian Affairs, and the Secretary of the Interior. The social worker certified that she sent the notices via registered or certified mail with return receipt requested. However, no proofs

3

of mailing or return receipts were filed with the court.  The notices included mother's married name, current and former addresses, and date and place of birth.  The notices also listed the names, current addresses, dates of birth, and places of birth of S.R's maternal grandparents, as well as the names, dates of birth, and places of birth of one set of S.R.'s maternal great-grandparents.  For each individual identified in the notices, the box for "Tribe or Band, and Location" was marked "Does not apply," and the box for "Tribal membership or enrollment number" was marked "Unknown."  The section on "Other relative information" was left blank except for the boxes in that section labeled "Tribe[,] band and location," which were marked "Does not apply."  On the section for "Indian Custodian Information," however, the "Tribe or Band, and Location" was identified as "Blackfeet Tribe of Montana."

The Blackfeet Tribe responded in a letter dated December 10, 2019 that S.R. was not listed on the tribal rolls.  The letter also stated, "As of August 30, 1962, our blood quantum requirement for enrollment is 1/4 Blackfeet blood.  The above children is/are not eligible for enrollment, and the child(ren) is/are not domiciled on the Blackfeet Indian reservation."  The letter, however, added, "If you are able to gather more information on the ancestry of the parents, please contact me again and I will review the tribal rolls."

On December 18, 2019, DCFS spoke to S.R.'s maternal grandfather, G.R., who provided further information regarding the relatives on his side of the family with Indian ancestry.  G.R. reported his family is from Honduras but his grandmother was affiliated with the "Blackfoot" tribe.  G.R. also stated he had received documentation indicating that he "in fact is Blackfoot"

4

but did not have such documentation in his possession. G.R. provided the names, dates of birth, and cities and states of residence for S.R.'s other set of maternal great-grandparents, As.R. and An.R. According to G.R., As.R. resided in Mandeville, Louisiana, and An.R. resided in Dallas, Texas. G.R. also provided the name, approximate date of birth, approximate date of death, and place of death for S.R.'s maternal great-great-grandmother, and the name, approximate date of death, and place of death for the child's maternal great-great-grandfather.

On December 20, 2019, DCFS mailed a second set of ICWA notices to the Bureau of Indian Affairs and the Secretary of the Interior. There is no indication in the record, however, that these second notices were sent to any tribe. The second notices added mother's maiden name, but otherwise included the same biographical information as the first notices regarding mother, the maternal grandparents, and one set of the maternal great-grandparents. The second notices also added the name and date of birth of S.R.'s other maternal great-grandmother, As.R., and the name, date of birth, and country of birth of the other maternal great-grandfather, An.R.. The notices did not, however, include the places of residence of As.R. and An.R. , even though G.R. had provided this information to DCFS. On the section for "Indian Custodian Information," the "Tribe or Band, and Location" was again identified as "Blackfeet Tribe of Montana."

In a response dated January 7, 2020, the Bureau of Indian Affairs stated that it had received the ICWA notice for S.R., and that the notice contained insufficient information to determine tribal affiliation.

On February 18, 2020, DCFS mailed a third set of ICWA notices to the Bureau of Indian Affairs and the Secretary of the

5

Interior, but not to any tribe. DCFS also filed certified mail receipts for the notices sent to the Bureau of Indian Affairs and the Secretary of Interior. The third notices contained the same biographical information as the second notices regarding mother, the maternal grandparents, and both sets of maternal great-grandparents, again omitting the latter set of great-grandparents' places of residence as provided by G.R. The "Blackfeet Tribe of Montana" was again named as the relevant tribe in the "Indian Custodian Information" section.

On July 22, 2020, DCFS mailed a fourth set of ICWA notices to the Bureau of Indian Affairs and the Secretary of the Interior, but not to any tribe. Certified mail receipts for the notices sent to the Bureau of Indian Affairs and the Secretary of Interior were filed with the court. The fourth notices included the same biographical information as the second and third notices regarding mother, the maternal grandparents, and both sets of maternal great-grandparents. These notices, however, added that the maternal grandmother denied any tribal membership, and that the maternal grandfather, G.R., claimed membership in the Blackfeet Tribe. The section on "Other relative information" was again left blank except for the boxes labeled "Tribe[,] band and location," which were all marked "Does not apply." Like the prior notices, the fourth notices identified the "Blackfeet Tribe of Montana" as the relevant tribe in the "Indian Custodian Information" section.

In a last minute information report filed on July 30, 2020, DCFS indicated that, on July 24, 2020, the social worker sent an email to the ICWA coordinator for the Blackfeet Tribe regarding S.R.'s ICWA eligibility. According to DCFS, it had not received any further responses about the child's ICWA status, and mother

6

had reported that she did not have any additional information about her family's tribal affiliation apart from that provided by the maternal grandfather.

In a last minute information report filed on October 14, 2020, DCFS informed the court that, due to an oversight, it had neglected to send the fourth set of notices to the Blackfeet Tribe. DCFS also stated that it had re-generated the notices to include the Blackfeet Tribe of Montana, and had sent a fifth set of notices via certified mail on October 1, 2020. As further reported by DCFS, the notice to the tribe arrived at the post office in Browning, Montana on October 10, 2020, and was available for pick up as of that date. On October 8, 2020, the social worker attempted to call the tribe's ICWA coordinator, but the call went unanswered and the social worker was unable to leave a voicemail message. On October 13, 2020, the social worker also emailed the tribe's ICWA coordinator to further inquire about S.R.'s eligibility status, but had not received a response. Certified mail receipts were filed for the notices sent to the Blackfeet Tribe of Montana, Bureau of Indian Affairs, and the Secretary of Interior, which confirmed that these notices were mailed on October 1, 2020.

At the October 15, 2020 adjudication hearing, the juvenile court found that ICWA did not apply to this case.[2] At the

---

[2] At the adjudication hearing, the court granted J.F.'s request to be dismissed from the case based on the paternity test results showing that he was not S.R.'s biological father. Although DCFS conducted due diligence as to other alleged fathers identified by mother, none of them appeared in the proceedings, and therefore, no inquiry could be made as to S.R.'s possible Indian ancestry on her paternal side.

7

November 16, 2020 disposition hearing, counsel for DCFS noted the court previously had found that ICWA did not apply, and that the alleged father, J.F., was no longer a part of the case. In response, the court stated it "agree[d] with all those previous prior findings that the court made on ICWA notice and paternity."

## DISCUSSION

On appeal, mother argues that both the juvenile court and DCFS failed to comply with the inquiry and notice requirements of ICWA and related California law. Mother specifically asserts that the evidence was insufficient to support the court's finding that ICWA did not apply because DCFS failed to conduct an adequate further inquiry into mother's claim of Indian ancestry, and failed to properly notice the relevant tribe. In response, DCFS contends that it satisfied its duty of further inquiry by interviewing the maternal grandfather and sending multiple sets of ICWA notices, and that any defects in notice were harmless because there was no reason to know S.R. was an Indian child.

We conclude there was substantial evidence to support the juvenile court's finding that ICWA did not apply because DCFS fulfilled its duty of inquiry, and based on such inquiry, there was no reason to know S.R. was an Indian child. We further conclude mother cannot show error in DCFS's alleged failure to properly notice the tribe because there was no reason to know S.R. was an Indian child, and thus, ICWA notice was not required.

## I.     ICWA Inquiry and Notice Requirements

ICWA provides that "[i]n any involuntary proceeding in a [s]tate court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child

8

shall notify the parent or Indian custodian and the Indian child's tribe" of the pending proceedings and the right to intervene. (25 U.S.C. § 1912(a).) Similarly, California law requires notice to the child's parent or Indian custodian and the child's tribe if there is reason to know that an Indian child is involved in the proceeding. (§ 224.3, subd. (a).) An " 'Indian child' " is defined as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); § 224.1, subd. (a).)

Both juvenile courts and child protective agencies "have an affirmative and continuing duty to inquire whether a child for whom a petition under Section 300 . . . may be or has been filed, is or may be an Indian child." (§ 224.2, subd. (a); see *In re Isaiah W.* (2016) 1 Cal.5th 1, 14 ["juvenile court has an affirmative and continuing duty in all dependency proceedings to inquire into a child's Indian status"].) Such duty generally " 'can be divided into three phases: the initial duty to inquire, the duty of further inquiry, and the duty to provide formal ICWA notice.' " (*In re Y.W.* (2021) 70 Cal.App.5th 542, 552.)

California law provides that the duty to inquire "begins with the initial contact" (§ 224.2, subd. (a)) and requires the juvenile court and child protective agency to ask all relevant involved individuals whether the child is or may be an Indian child (§ 224.2, subds. (a)-(c)). If a child is placed in the agency's temporary custody, the agency must inquire whether the child is an Indian child by asking a nonexclusive group that includes the child, the parents, and extended family members. (§ 224.2, subd. (b)). At the first appearance of each party, the court must inquire whether the appearing party knows or has reason to know that

the child is an Indian child.  (§ 224.2, subd. (c).)  The court also must instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child.  (Ibid.)[3]

If the juvenile court or the child protective agency "has reason to believe that an Indian child is involved in a proceeding, but does not have sufficient information to determine that there is reason to know that the child is an Indian child," the court or social worker "shall make further inquiry regarding the possible Indian status of the child . . . as soon as practicable."  (§ 224.2, subd. (e).)  "[R]eason to believe" means the court or social worker has information "suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe."  (§ 224.2, subd. (e)(1).)  "Further inquiry includes, but is not limited to . . . [i]nterviewing the parents, Indian custodian, and extended family members," and "[c]ontacting the tribe or tribes and any other person that reasonably can be expected to have information regarding the child's membership, citizenship status, or eligibility."  (§ 224.2, subd. (e)(2)(A),(C).)

---

[3] There is "reason to know" a child is an Indian child when: a person having an interest in the child informs the juvenile court the child is an Indian child; the residence of the child, the child's parents, or the child's Indian custodian, is on a reservation or in an Alaskan Native village; a participant in the proceeding, officer of the court, Indian tribe or organization, or agency informs the court it has discovered information indicating the child is an Indian child; the child gives the court reason to know that the child is an Indian child; the court is informed that the child is or has been a ward of a tribal court; or the court is informed either the parent or the child possesses an identification card indicating membership or citizenship in an Indian tribe.  (§ 224.2, subd. (d).)

Both federal and state law set forth specific requirements for providing ICWA notice once there is reason to know that an Indian child is involved in the proceeding.  Under the applicable federal regulations, the juvenile court must ensure that the party seeking a foster care placement or termination of parental rights promptly send notice to the child's tribe, the child's parents, and if applicable, the child's Indian custodian.  (25 C.F.R. § 23.111(a)-(c) (2022).)  California law likewise requires that ICWA notice be sent to the child's parents or legal guardian, the Indian custodian, if any, and the child's tribe.  (§ 224.3, subd. (a); see Cal. Rules of Court, rule 5.481(c)(1) ["[i]f it is known or there is reason to know that an Indian child is involved . . ., the social worker . . . must send *Notice of Child Custody Proceeding for Indian Child* (form ICWA-030) to the parent or legal guardian and Indian custodian of an Indian child, and the Indian child's tribe"].)  Both federal and state law further require that the notices be sent by registered or certified mail with return receipt requested (25 C.F.R. § 23.111(c); § 224.3, subd. (a)(1)), and that copies of the notices, along with any return receipts or other proofs of services, be filed with the court (25 C.F.R. § 23.111(a)(2); § 224.3, subd. (c)).

"If the [juvenile] court makes a finding that proper and adequate further inquiry and due diligence . . . have been conducted and there is no reason to know whether the child is an Indian child, the court may make a finding that [ICWA] does not apply to the proceedings, subject to reversal based on sufficiency of the evidence." (§ 224.2, subd. (i)(2).)  A finding that ICWA does not apply thus " ' "implies that . . . social workers and the court did not know or have a reason to know the children were Indian children and that social workers had fulfilled their duty of

11

inquiry." ' " (*In re Josiah T.* (2021) 71 Cal.App.5th 388, 401.) We generally review the juvenile court's ICWA findings under the substantial evidence test, " ' "which requires us to determine if reasonable, credible evidence of solid value supports the court's order." ' " (*Ibid.*) " ' "[W]e do not consider whether there is evidence from which the [juvenile] court could have drawn a different conclusion but whether there is substantial evidence to support the conclusion that the court did draw." ' " (*In re Q.M.* (2022) 79 Cal.App.5th 1068, 1080.)

## II.  Substantial evidence supported the juvenile court's finding that ICWA did not apply to the proceedings

In this case, mother's statements in her ICWA-20 form and at her first court appearance, indicating that she may have "Blackfoot"[4] ancestry on the paternal side of her family, triggered DCFS's duty to conduct further inquiry into S.R.'s possible Indian ancestry. DCFS does not contend otherwise, nor could it since the juvenile court ordered it to investigate mother's claim at the August 5, 2019 detention hearing. (See, e.g., *In re T.G.* (2020) 58 Cal.App.5th 275, 292 [mother's ICWA-20 form declaring her belief she had Cherokee ancestry "unquestionably provided

---

[4] "[T]here is frequently confusion between the Blackfeet tribe, which is federally recognized, and the related Blackfoot tribe, which is found in Canada and thus not entitled to notice of dependency proceedings. When Blackfoot heritage is claimed, part of the [a]gency's duty of inquiry is to clarify whether the parent is actually claiming Blackfoot or Blackfeet heritage so that it can discharge its additional duty to notice the relevant tribes." (*In re L.S.* (2014) 230 Cal.App.4th 1183, 1198.) Here, it appears DCFS believed ancestry was claimed through the Blackfeet tribe because the agency identified the Blackfeet Tribe of Montana as the relevant tribe in the ICWA notices it sent.

12

reason to believe Indian children might be involved in these dependency proceedings and triggered the Department's duty to make further inquiry"]; *In re A.M.* (2020) 47 Cal.App.5th 303, 322 [mother's statement that she believed she may have Indian ancestry with the Blackfeet and Cherokee tribes but was not registered "was sufficient to require further inquiry, as the juvenile court ordered"].)

Rather, the parties dispute whether the evidence was sufficient to support a finding by the juvenile court that DCFS adequately discharged its duty to further inquire into S.R.'s possible Indian ancestry.  DCFS argues that it satisfied its duty of further inquiry because it interviewed the maternal grandfather, G.R., about his Indian heritage and sent a total of five sets of ICWA notices, each of which included the maternal grandfather's name, current address, date of birth, and country of birth.  Mother asserts, however, that DCFS's inquiry was insufficient because there were several other known extended family members of whom no inquiry was ever made.  Mother specifically identifies the maternal grandmother, a maternal aunt, and the maternal great-grandparents, As.R. and An.R., as additional relatives that DCFS should have interviewed. Based on the record before us, we conclude the juvenile court reasonably could find that DCFS conducted an adequate further inquiry into S.R.'s possible Indian ancestry, and that, based on such inquiry, there was no reason to know S.R. was an Indian child.  The court's finding that ICWA did not apply accordingly was supported by substantial evidence.

In response to the information provided by mother about her family's "Blackfoot" ancestry, DCFS conducted an adequate further inquiry by interviewing the maternal grandfather, G.R.,

13

and by contacting the Bureau of Indian Affairs, the Secretary of the Interior, and the Blackfeet Tribe of Montana to investigate mother's claim. In his interview with DCFS, G.R. reported that his now-deceased grandmother, the child's maternal great-great-grandmother, was affiliated with the "Blackfoot Tribe," and that G.R. previously had documentation indicating that he "in fact is Blackfoot." G.R. provided biographical information about the child's maternal great-grandparents, As.R. and An.R., including their names, dates of birth, and cities and states of residence. G.R. also provided biographical information about the child's maternal great-great-grandparents, including the great-great-grandmother's married name, approximate date of birth, approximate date of death, and city and state of death.

The fifth set of ICWA notices that DCFS prepared and sent to the Blackfeet Tribe on October 1, 2020 included identifying information about mother, the maternal grandparents, and both sets of maternal great-grandparents. The notices also indicated that the maternal grandfather, G.R., was claiming membership in the Blackfeet Tribe. In addition, the social worker reported that she emailed the Blackfeet Tribe's ICWA coordinator on two separate occasions to further inquire about S.R.'s eligibility for membership in the tribe. Apart from its initial letter indicating that S.R. was not listed on the tribal rolls, the Blackfeet Tribe did not respond to any of DCFS's further inquiries.

Mother contends that DCFS did not satisfy its duty of further inquiry because it failed to make any inquiry of either the maternal grandmother or a maternal aunt, both of whom were known to DCFS during the proceedings. The record reflects, however, that DCFS must have asked the maternal grandmother about her Indian ancestry because the ICWA notices specifically

14

stated that the maternal grandmother had denied any tribal membership. The record further reflects that mother solely had identified her father's side of the family as having Indian ancestry, and as discussed, DCFS interviewed the maternal grandfather, G.R., about his tribal affiliation. While it appears DCFS did not make any inquiry of the maternal aunt, there is no indication that this relative might have possessed information about the maternal grandparents' Indian ancestry that was different from, or in addition to, that provided by the maternal grandparents themselves. Rather, based on the ICWA-related inquiries made to both the maternal grandmother and the maternal grandfather, DCFS reasonably could have concluded that no further meaningful information about S.R.'s Indian ancestry could be obtained from the maternal aunt. (See *In re Darian R.* (2022) 75 Cal.App.5th 502, 510 [where parents and paternal aunt denied Indian ancestry, record did not support "unvarnished contention" that additional interviews of extended family members would have "meaningfully elucidated the children's Indian ancestry"]; *In re D.S.* (2020) 46 Cal.App.5th 1041, 1053 [even if child's great-grandmother was person reasonably expected to have information regarding the child's Indian status, social services agency could reasonably conclude from its contact with child's aunt "that no further inquiry was needed because there was no further information of value to obtain from this third party"].)

Mother also claims DCFS failed to conduct an adequate further inquiry because it did not make any effort to contact the maternal great-grandparents, As.R. and An.R., even though it had information about where they lived. The record reflects, however, that the maternal grandfather, G.R., solely provided

15

DCFS with each great-grandparent's name, date of birth, and city and state of residence.  There is no indication that G.R. gave a current address, telephone number, or other contact information for these individuals.  Rather, the juvenile court reasonably could have inferred from the record that, if G.R. had an available means of contacting either of the maternal great-grandparents, DCFS would have obtained such information from him and included it in its reports.  As this court has observed, "[w]hile we believe it reasonable in many cases to require DCFS to follow up on leads provided by the parents, we cannot ask the agency to . . . interview individuals for whom no contact information has been provided."  (*In re Q.M.*, *supra*, 79 Cal.App.5th at p. 1082; see *In re A.M.*, *supra*, 47 Cal.App.5th at p. 323 ["ICWA does not obligate the court or [child protective agency] 'to cast about' for investigative leads"]; *In re Charlotte V.* (2016) 6 Cal.App.5th 51, 58 [speculative to assume that relatives interviewed by child protective agency had detailed information about direct lineal ancestors because they "were very forthcoming about [the child's] Indian ancestry" and "[p]resumably, they would have provided that information if it was known"].)

Moreover, based on the information provided by G.R. about the family's tribal affiliation, the juvenile court reasonably could have found that DCFS fulfilled its duty of inquiry, and that there was no reason to know S.R. was an Indian child.  While G.R. stated that he previously had received documentation showing that he "in fact is Blackfoot," he did not indicate whether he was a registered member of the tribe.  He also did not provide any information suggesting that either S.R. or the child's mother was a member of the tribe or was eligible for membership in the tribe. (§ 224.1, subd. (e)(1).)  Further inquiry is necessary to help the

16

juvenile court or the child protective agency "determine whether there is reason to know a child is an Indian child." (§ 224.2, subd. (e)(2).) However, there is reason to know a child is an Indian child only when one of six statutory criteria is met —e.g., (1) the court has been advised that the child is an Indian child, (2) the child's or parent's residence is on a reservation, (3) any participant in the proceeding informs the court that it has discovered information indicating the child is an Indian child, (4) the child gives the court reason to know that he or she is an Indian child, (5) the child is or has been a ward of a tribal court, or (6) either parent or the child possess an identification card indicating membership or citizenship in an Indian tribe. (§ 224.2, subd. (d).) Here, none of the information provided by G.R. gave DCFS or the juvenile court a reason to know S.R. was an Indian child. Accordingly, on this record, there was sufficient evidence for the court to conclude that an adequate further inquiry had been made.

## III. DCFS was not required to provide notice to the tribe

In addition to arguing that DCFS failed to satisfy its duty of inquiry, Mother also asserts that DCFS did not properly notice the relevant tribe because the ICWA notices that it sent to the Blackfeet Tribe omitted certain biographical information about S.R.'s maternal family. Mother further argues that the ICWA notices were defective because DCFS did not file return receipts for the notices as required by section 224.3, subdivision (c), and the juvenile court did not wait 10 days after the tribe's receipt of the fifth set of notices to determine whether ICWA applied as required by section 224.3, subdivision (d). Mother's arguments regarding notice lack merit, however, because notice to the tribe was not required in this case.

17

ICWA notice is required only if, after initial and further inquiries, there is "reason to know" that an Indian child is involved in the proceeding.  (§§ 224.2, subd. (f), 224.3, subd. (a).)  As we have described, there is "reason to know" a child is an Indian child if any one of six statutory criteria is met.  (§ 224.2 subd. (d).)  In this case, because none of the criteria were met, the duty to provide ICWA notice was never triggered.  (See *In re Q.M.*, *supra*, 79 Cal.App.5th at p. 1084 [rejecting mother's claim that notices to tribes failed to provide complete information for direct lineal ancestors because there was no reason to know the child was an Indian child, and thus, ICWA notice was not required]; *In re Austin J.* (2020) 47 Cal.App.5th 870, 887 [juvenile court did not err in failing to ensure notice was provided in accordance with ICWA because statements by maternal family that children may have Cherokee ancestry did not provide reason to know an Indian child was involved in the proceeding].)  Any deficiencies in the notices sent by DCFS, therefore, were legally irrelevant.  (*In re Q.M.*, at p. 1084.)

## DISPOSITION

The section 366.26 order terminating parental rights over S.R. is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


RICHARDSON (ANNE K.), J.*

We concur:


LAVIN, Acting P. J.


EGERTON, J.

---